**MICHAEL HUESTON**
ATTORNEY AT LAW

16 COURT STREET
35TH FLOOR
BROOKLYN, NEW YORK 11241

Tel: (718) 246-2900
Fax: (718) 246-2903
Email: mhueston@nyc.rr.com

ADMITTED NY

August 28, 2022

**BY ECF**
The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Smith, et al.*, 19 Cr. 284 (RJD)

Your Honor:

Gary Kaufman and I represent Mr. Jessie Smith. We provide the following post-hearing arguments and comments for the Court's consideration.

**A. The overdose deaths should not be attributed to Jessie Smith, under U.S.S.G. §§ 2D1.1, 2D1.2; 5K2.1; or 18 U.S.C. 3553(a)**

In order for the Court to assess an enhancement or make an upward departure on the basis that narcotics sold by Jessie Smith resulted in the deaths of any of the three individuals alleged, the Court must be satisfied that the government proved by a preponderance of the evidence that narcotics sold by Mr. Smith were a "but-for" cause of the decedents' death. *Burrage v. United States*, 571 U.S. 204, 134 S.Ct. 881, 883 (2014). Drugs sold by a defendant are the but-for cause of death, only when "other factors alone would not have done so." *United States v. Coll*, 762 F. App'x 56, 59 (2d Cir. 2019). In the instant matter, it has neither been established that Mr. Smith was the individual who sold Victor Cubero, Jose Reyes, or Victor Fuentes narcotics that they ingested around the time of their death, nor even if he had, that the drugs Mr. Smith sold were the but-for cause of the deaths of those individuals, such that other factors alone, might not have been responsible for their demise. After all, as the government's expert, Dr. Gail Cooper stated, the mere fact that someone has drugs in their system at their time of death does not necessarily mean that those drugs killed that individual, or that natural causes, for example, are precluded as a cause of death.[1] Likewise, as Dr. Cooper confirmed, someone who took drugs one day and died the following day of natural causes, may still test positive for drugs, including fentanyl.[2]

[1] *See* Fatico Hearing Transcripts from July 19 and August 12, 2022 ("Tr."), at 34.

[2] *Id.* at 40.

The reality is that Mr. Smith was far from the only drug dealer, who may have been selling heroin combined with fentanyl, which can be shown by the fact that fentanyl and heroin overdoses have not stopped since Mr. Smith was arrested in June 2019, but in fact have increased in frequency, since the time of Mr. Smith's arrest.[3] FBI Special Agent John Basso acknowledged that Mr. Smith was not the only drug dealer in his geographic area[4] and Jose Martinez testified about there being a large number of dealers in the area, as well, such that he always had someone to buy from, even after Mr. Smith was arrested.[5] The unfortunate reality is that it is more common to see heroin combined with fentanyl than heroin being sold on its own.[6] The mere fact that an individual had heroin combined with fentanyl in their system at their time of death does not indicate where the narcotics were purchased or from what dealer they were purchased,[7] and in the instant case there was nothing unique about the mixture of substances found in the autopsies of the decedents that could be used to narrow down the origin of the drugs.[8]

In fact, addicts, like Jose Martinez, will sometimes obtain two separate drugs and combine them on their own.[9] Mr. Smith did not sell fentanyl by itself,[10] and in fact, according to Mr. Martinez, was not even aware that the heroin he sold contained fentanyl.[11] Although Mr. Smith was the subject of wiretaps, he never mentioned any of the alleged overdoses in any recorded telephone calls.[12] In the instant matter the Court has the advantage of a large sample size of Mr. Smith's drugs to see that they, in fact, were not especially deadly. Jose Martinez testified to using 20 to 30 bags from Mr. Smith each day, to testing each of Mr. Smith's batches of drugs, and to swallowing the drugs on occasion, and, as he testified, he never suffered an overdose.[13] Mr. Martinez further testified that Mr. Smith had the best heroin, and that what makes heroin better, is the lack of fentanyl in it.[14] Further, other evidence related to the actual

---

[3] *Id.* at 29, 30.

[4] *Id.* at 151.

[5] *Id.* at 253.

[6] *Id.* at 30.

[7] *Id.* at 30.

[8] *Id.* at 31.

[9] *Id.* at 258.

[10] *Id.* at 259.

[11] *Id.* at 256.

[12] *Id.* at 139.

[13] *Id.* at 253, 254.

[14] *Id.* at 255.

connection between the narcotics in the systems of the decedents at the time of their death and Mr. Smith was lacking as well, as described below.

**1. The government has not proven that narcotics purchased from Jessie Smith were the but-for cause of the death of Victor "Meatball" Cubero**

The government has not proven that the narcotics that were in Mr. Cubero's system at the time of his death were obtained from Jessie Smith. The unusual occurrence report[15] prepared after Mr. Cubero was found not breathing and unresponsive in his apartment, stated that Mr. Cubero's son stated that Mr. Cubero used an "unknown" narcotic,[16] and does not indicate where this narcotic came from. There were no eyewitnesses who saw Mr. Smith sell Mr. Cubero the narcotics that were in his system at the time of his death,[17] nor was there any surveillance video of such a sale.[18] There was no DNA taken from the scene where Mr. Cubero was found that connected Mr. Smith to the narcotics in Mr. Cubero's system at his time of death.[19]

Agent John Basso testified his theory that the narcotics that were in Mr. Cubero's system came from Mr. Smith because a cell phone recovered at the time that Mr. Cubero was found deceased in his apartment,[20] had Mr. Smith's contact information in it.[21] Agent Basso stated there had been calls between the two phones on the day prior to Mr. Cubero's death,[22] although the substance of those calls is unknown. However, there was other evidence in Mr. Cubero's phone that suggested that he was communicating with at least one other drug dealer around the time of his death, including a drug dealer who texted, "Fire on deck" to Mr. Cubero, which Agent Basso acknowledged means that the other drug dealer who sent that text had new product.[23] There was still another person, who sent a text to Mr. Cubero about money Mr. Cubero owed him, which Agent Basso surmised was likely for drugs.[24]

The government's other bases forming that connection were from conversations with a cooperating witness named Grace Colom,[25] and Jose Martinez. However, Ms. Colom, who Jose

[15]GX 602.

[16]Tr. at 124.

[17]*Id.* at 142.

[18]*Id.* at 142, 143.

[19]*Id.* at 143.

[20]*Id.* at 124, 143.

[21]GX 604, Tr. at 125.

[22]Tr. at 126.

[23]DX 10, JS 4044, and Tr. at 151.

[24]Tr. at 152.

[25]*Id.* at 143, 144.

Martinez classified as a thief and an exaggerator[26], did not state that she saw Mr. Smith give Mr. Cubero the drugs in his system the day he died.[27] Her conclusion that Mr. Smith had provided those drugs was merely a guess or a theory.[28] Likewise, Mr. Martinez, classified Mr. Cubero as a customer of Mr. Smith's.[29] However, Mr. Martinez did not see Mr. Cubero use or obtain any narcotics on the day he died,[30] and did not know the source of the drugs.[31]

Although there is clearly no evidence that the narcotics that were in Mr. Cubero's system at the time of his death originated with Mr. Smith, there is still no proof that those drugs were the but-for cause of his death. What is clear from Mr. Cubero's autopsy report,[32] and the testimony of both experts for the government and the defense, is that Mr. Cubero suffered from a number of complicating factors, in addition to his drug use. These factors were significant enough that at the time of Mr. Cubero's death, a tag with the insignia of the Office of the Chief Medical Examiner, listed Mr. Cubero as having died of natural causes.[33] These additional factors include the fact that Mr. Cubero was an overweight man[34] who suffered from hypertensive cardiovascular disease.[35] Mr. Cubero, had also been complaining about pain in his legs shortly before his death, which could have been evidence of a blood clot, which when untreated can prove fatal.[36] Further, Mr. Cubero was a tobacco user,[37] the use of which the autopsy report did not rule out as a cause of death.[38] Additionally, there were not illicit substances found in the room with Mr. Cubero at the time of his death,[39] which could be evidence that although Mr. Cubero had narcotics in his system from earlier in the day, it was something else that killed him. Defense expert, Dr. Cyril Wecht testified, consistent with his report[40] that either of the drugs in

---

[26] *Id.* at 263.

[27] *Id.* at 149.

[28] *Id.* at 148, 149.

[29] *Id.* at 221.

[30] *Id.* at 260.

[31] *Id.* at 261.

[32] GX 601.

[33] DX 6, and Tr. at 37.

[34] GX 601, 3677, and Tr. at 43.

[35] GX 601, JS 3673, and Tr. at 41.

[36] GX 601, 3691, and Tr. at 47.

[37] GX 601, JS 3677.

[38] Tr. at 45.

[39] GX 601, 3691, and Tr. at 46.

[40] DX 5.

Mr. Cubero's system alone could have killed him, especially in light of the fact that he had "underlying heart disease."[41] This is bolstered by the fact that Mr. Cubero did not die suddenly and was outside, not using drugs and feeling sick in the hours leading up to his passing.[42] This conclusion rebuts the assertion of any of the specific drugs in Mr. Cubero's system as the but-for cause of his death.

**2. The government has not proven that narcotics purchased from Jessie Smith were the but-for cause of the death of Jose "Pepo" Reyes**

The government has not proved that the narcotics that were in Mr. Reyes' system at the time of his death were obtained from Jessie Smith. Agent John Basso testified that the government had evidence that Mr. Smith was Mr. Reyes' dealer[43] but never explained what that evidence was, nor did the government present any specific evidence that Mr. Smith sold Mr. Reyes the drugs that he consumed. No members of Mr. Reyes' family ever identified Mr. Smith as his drug dealer.[44] There were no eyewitnesses who saw Mr. Smith sell Mr. Reyes the narcotics that were in his system at the time of his death,[45] nor was there any surveillance video of such a sale.[46] There was no DNA taken from the scene where Mr. Reyes was found that connected Mr. Smith to the narcotics in Mr. Reyes' system at his time of death.[47] In fact, Agent Basso was unable to determine when Mr. Reyes actually took the drugs that contributed to his death.[48]

It appears that the government's only basis for forming the theory that Mr. Reyes died from drugs obtained from Mr. Smith were conversations with Grace Colom and Jose Martinez. However, Ms. Colom, stated that she merely believed that Mr. Reyes died from heroin purchased from Mr. Smith, but did not indicate that she had any evidence to support that belief.[49] Mr. Martinez testified that he did not see Mr. Reyes use or obtain any narcotics on the day he died,[50]

---

[41]Tr. at 167.

[42]*Id.* at 260.

[43]*Id.* at 138.

[44]*Id.* at 140.

[45]*Id.* at 138.

[46]*Id.* at 142, 143.

[47]*Id.* at 139.

[48]*Id.*

[49]*Id.* at 146.

[50]*Id.* at 261.

and did not know where Mr. Reyes got his drugs from on that day.[51] Nor did Mr. Reyes know which of the dealers in the building Mr. Reyes would buy from an any given day.[52]

Although there is clearly no evidence that the narcotics that were in Mr. Reyes' system at the time of his death originated with Mr. Smith, there is still no proof that those drugs were the but-for cause of his death. Like with Mr. Cubero, Mr. Reyes' autopsy report,[53] showed a number of complicating factors, in addition to his drug use. In fact, the autopsy report listed Mr. Reyes' cause of death as, not exclusively the narcotics he ingested, but as also his chronic drug use, which went back years.[54] Likewise, in the final diagnoses section of the autopsy report, Mr. Reyes' history of chronic alcoholism and substance abuse were listed.[55] Additionally, at the time of his death, in addition to any illegal drugs that Mr. Reyes had ingested, he also had alcohol in his system.[56] Additional factors that could have contributed to Mr. Reyes' demise include the fact that he suffered from cirrhosis and steatosis of the liver[57] as well as the fact that Mr. Reyes was an older, overweight man[58] who suffered from hypertension.[59] Defense expert, Dr. Cyril Wecht, testified, consistent with his report,[60] that either the heroin in Mr. Reyes' system alone, or combined with alcohol could have killed him, even without fentanyl.[61] This conclusion rebuts the assertion of any of the specific drugs in Mr. Reyes' system as the but-for cause of his death.

### 3. The government has not proven that narcotics purchased from Jessie Smith were the but-for cause of the death of Victor Fuentes

The government has not proven that the narcotics that were in Victor Fuentes' system at the time of his death were obtained from Jessie Smith. Mr. Fuentes, was even further removed from Mr. Smith than Mr. Cubero and Mr. Reyes. Unlike those men, Mr. Fuentes did not die in the area around the Bushwick houses, where Jessie Smith lived, but died at a single resident occupancy hotel in Queens.[62] The government presented no evidence that Mr. Fuentes was ever

---

[51]*Id.* at 261, 262.

[52]*Id.* at 262.

[53]GX 801.

[54]GX 801, JS 4234, and Tr. 25, 48.

[55]GX 801, JS 4234.

[56]GX 801, JS 4238.

[57]GX 801, JS 4234, and Tr. at 48, 49.

[58]Tr. at 263.

[59]GX 801, JS 4234, and Tr. at 49.

[60]DX 5.

[61]Tr. at 165.

[62]GX 704, and Tr. at 128.

in the area around the Bushwick Houses or had ever met Jessie Smith. Neither Grace Colom, nor Jose Martinez made any mention of Mr. Fuentes. There were no eyewitnesses who saw Mr. Smith sell Mr. Fuentes the narcotics that were in his system at the time of his death,[63] nor was there any surveillance video or wiretap evidence of such a sale.[64] There was no DNA or fingerprints taken from the scene where Mr. Fuentes was found that connected Mr. Smith to the narcotics in Mr. Fuentes' system at his time of death.[65] The only evidence about where Mr. Fuentes purchased heroin, was included in the autopsy report, which stated that Mr. Fuentes' grandmother has previously caught him buying heroin online.[66] There is no evidence that Mr. Smith ever sold any drugs online.

It appears that the government's only basis for forming the conclusion that Mr. Fuentes died from drugs obtained from Mr. Smith were phone records which showed that three calls, of short duration, were made from a number associated with Mr. Fuentes to a number associated with Mr. Smith on March 3, 2019.[67] The government did not present any evidence of what was discussed in these brief calls,[68] which could have included Mr. Smith telling Mr. Fuentes not to call him or that he was out of drugs, prior to Mr. Fuentes obtaining narcotics from someone else. As Agent Basso admitted, it is merely speculation to assert what was said during those phone calls.[69] Further there are no cell site records to determine where Mr. Fuentes was, when he was using his phone,[70] if it, in fact, was him using that phone.

Although there is clearly no evidence that the narcotics that were in Mr. Fuentes' system at the time of his death originated with Mr. Smith, there is still no proof that those drugs were the but-for cause of his death. In fact, the government's expert, Dr. Cooper testified that the amount of both morphine, which is a major component in heroin, and fentanyl, found in Mr. Fuentes' blood after his death were consistent with lawful use that does not produce death.[71] Like the other two men who passed away, Mr. Fuentes' autopsy report,[72] showed a number of complicating factors, in addition to his March 4, 2019 drug use, including the fact that he had a previous overdose.[73] Additionally, at the time of his death, a bottle cap with an unknown liquid

---

[63] Tr. at 140.

[64] *Id.*

[65] *Id.*

[66] GX 701, JS 3788.

[67] Tr. at 130, 131.

[68] *Id.* at 141.

[69] *Id.*

[70] *Id.* at 142.

[71] *Id.* at 23.

[72] GX 701.

[73] GX 701, JS 3788, and Tr. at 54.

was found near Mr. Fuentes,[74] and Mr. Smith "only dealt in powder and rock",[75] such that Mr. Fuentes may have ingested another substance that contributed to his death.

Defense expert, Dr. Cyril Wecht testified, consistent with his report[76] that for all of the decedents, it was not possible to determine specifically which drug killed them, further complicating the government's ability to prove that any specific drug was the but-for cause of Mr. Fuentes, or the other men's deaths.

**B. The government failed to prove that an aggravating role adjustment under U.S.S.G. § 3B1.1 is merited**

Before imposing an enhancement under U.S.S.G. § 3B1.1, a district court must make a finding as to why a particular section applies, so as to permit meaningful appellate review. *See United States v. Ware,* 577 F.3d 442, 451 (2d Cir. 2009) (citation omitted). The decision to apply a role enhancement involves a two-part determination: first, whether the criminal activity involved at least five participants or was "otherwise extensive"; and second, the roles occupied by the defendants within the conspiracy. The government failed to prove either that the criminal activity that Mr. Smith has pled guilty to involved at least five participants or that he played an aggravating leadership role by a preponderance of the evidence.

First, the evidence presented by the government fails to prove that the criminal activity that Mr. Smith has pled guilty to involved "five or more participants." U.S.S.G. §§ 3B1.1(a) and (b). A participant in criminal activity is "a person who is criminally responsible for the commission of the offense" although they "need not have been convicted" of the offense. U.S.S.G. §§ 3B1.1, cmt. n. 1. The *Fatico* hearing showed, in fact, that many of the individuals that the government alleged were criminally responsible for the criminal offense that Mr. Smith was engaged in, were instead actually working at their own separate, competing, criminal operations. For instance, Kendall Johnson, Saquan Warlick, and Tyrell Spellman were targets of the same investigation, as Mr. Smith, and arrested at around the same time Mr. Smith was.[77] These individuals were part of the same investigation as Mr. Smith, because, like him, they were selling drugs in and around Bushwick Houses at the same time.[78]

Agent Basso theorized that all four of these drug dealers worked together, largely through wiretap interceptions,[79] which only showed brief, largely meaningless, conversations between them. However, this assertion is contradicted by the fact that of these three individuals (other than Mr. Smith) only Kendall Johnson's number was saved in Mr. Smith's phone, and of the

---

[74] DX 11, and Tr. at 154.

[75] Tr. at 155.

[76] DX 5.

[77] Tr. at 62.

[78] *Id.*

[79] Tr. at 63.

fifteen numbers saved in Mr. Smith's phone only three individuals were "relevant to the narcotics investigation" at all.[80] These three individuals included Jose Martinez, who testified that he did not sell for Mr. Smith,[81] but was a customer,[82] who independently resold some of the drugs he purchased to make an independent profit for himself and to buy drugs on behalf of other customers, who asked him to, not on at the behest of Mr. Smith.[83]

In fact, the chart produced by the government, GX 008, which purported to show texts that demonstrate that Mr. Smith was working with and leading others, is more consistent with a dealer communicating directly with his customers, informing them of his location and making sure the police do not interrupt his sale to them, than it is with working in a group of five or more or exercising any supervisory authority. It is likewise consistent with individuals simply giving "a heads-up" that police are around, which Mr. Martinez testified is a common practice in the projects, even for people who do not work together.[84] Further, charts like GX 009, show communications about smoking marijuana and hanging out with Saquan Warlick and Kendall Johnson, rather than working with them in a drug sales operation. The same applies to GX 518, which is as, if not more, consistent with social communication with "Haiti" as it is with working together to sell drugs. Further, gossip about another dealer getting caught with drugs, like GX 302, does not indicate working together, as much as it shows two individuals, in the same line of business, gossiping about another competitor.

The government additionally relied on the testimony of Jose Martinez, to place these and other individuals in the same scheme as Mr. Smith, however, his testimony largely failed to do this. Mr. Martinez, described Kendall Johnson, "Duke," as a drug seller, but not as a drug seller who worked for, or with, Mr. Smith.[85] Mr. Martinez referred to Tyrell Spellman, "Ruboy," as a drug seller, who when questioned as to if he sold for Mr. Smith, stated, "They all hang out together."[86] This assumes, without proof, that if two independent drug dealers are friends with one another, they must be part of the same scheme even if their interactions are purely social. Likewise, Mr. Martinez referred to Saquan Warlick, "SB," as a drug dealer and Mr. Smith's "man,"[87] but failed to explain what that means aside from that Mr. Warlick sells drugs and has a close relationship with Mr. Smith. It does not show that the relationship is professional or anything other than a close personal relationship.

---

[80]Tr. at 86.

[81]*Id.* at 241.

[82]*Id.* at 242.

[83]*Id.* at 179, 180, 198, 245, 246.

[84]*Id.* at 248.

[85]*Id.* at 212.

[86]*Id.* at 213.

[87]*Id.*

Other individuals, such as "Gamble" and Annette Chisholm, who the government alleges were part of Mr. Smith's criminal activity, as a crack cook, have not been shown to occupy the roles alleged, though any actual evidence, outside of the flawed, non-credible testimony of drug-user Jose Martinez.[88] For example, Mr. Martinez said he knew that Ms. Chisholm cooked crack for Mr. Smith, because she held his materials in her house,[89] but did not explain how he knew this information. Further Mr. Martinez could not state why Ms. Smith used Ms. Chisholm to cook crack,[90] which further weakens the credibility of this assertion. The reliance on Mr. Martinez to establish Mr. Smith's business relationships is flawed in that Mr. Martinez stated that he was merely Mr. Smith's customer,[91] who never saw Mr. Smith splitting profits with anyone,[92] did not know the number of people Mr. Smith worked with,[93] or how Mr. Smith's drug operation was organized, if it was organized at all.[94] The reality is that the person who the government is relying on to establish an aggravating role – almost in its entirety – was someone who Mr. Smith did not involve or discuss his business with.[95]

The *Fatico* hearing showed that rather than organizing, leading, managing, or supervising the activity that he pled guilty to, Mr. Smith worked largely independently, even if he did at times render and get the assistance of other independent drug dealers and customers. This work, as an independent drug dealer, can be seen in the government's own evidence presented at the *Fatico* hearing. Rather than present evidence that Mr. Smith was directing other individuals to sell drugs for him, most of the evidence presented, like the video surveillance still in GX 001, showed Mr. Smith making sales directly to customers.[96] This is clear, when looking at the evidence presented at the *Fatico* hearing and applying it to the factors that distinguish a defendant's role of "organizer or leader" from that of a "manager or supervisor," which are: 1) the exercise of decision making authority; 2) the nature of participation in the commission of the offense; 3) the recruitment of accomplices; 4) the claimed right to a larger share of the fruits of the crime; 5) the degree of participation in planning or organizing the offense; 6) the nature and

---

[88] *Id.* at 206, 207, 233 (Jose Martinez is a clearly non-credible witness, based on testimony that over the time period he was testifying about he was ingesting 20-30 bags of heroin and crack daily, and was "high all the time." *Id.* at 234 (Additionally, during this time period, Mr. Martinez was drinking 80 ounces of beer a day, rendering him drunk. *Id.* at 234 (The combined effect of this made it hard for him to remember everything. *Id.* at 236-238 (Further, Mr. Martinez was testifying to avoid a guideline range of 63-78 months and a mandatory minimum sentence of five years, which the Court acknowledged made him highly motivated to get a USSG § 5K1.1 letter).

[89] *Id.* at 206.

[90] *Id.* at 207.

[91] *Id.* at 242.

[92] *Id.* at 243.

[93] *Id.* at 243, 244.

[94] *Id.* at 244.

[95] *Id.*

[96] *Id.* at 78.

scope of the illegal activity; and 7) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, cmt. n.4.

While the government has presented the text and phone communications described above, there is little to no evidence presented that Mr. Smith was giving direct orders to anyone. To the extent he was making decisions, he was doing so for his own drug selling business, where he bought and sold narcotics and communicated with customers himself. The government has presented no evidence that Mr. Smith recruited any accomplices; rather it has shown that Mr. Smith's customers, like Mr. Martinez came looking for him. There has been no evidence presented about the division of the proceeds from drug sales or the planning or structure of those sales. In fact, the evidence showed quite the opposite. Mr. Smith did not make a calendar assigning different individuals to sell drugs at different times, but rather sold the drugs himself from morning to night.[97] This was not a widespread operation with many locations, but rather an operation where customers contacted Mr. Smith directly and purchased narcotics from him directly in the fourth-floor stairwell of 130 Moore Street. Additionally, the government, did not present any evidence that Mr. Smith exercised any control or authority over others. The absence of evidence supporting any of the U.S.S.G. § 3B1.1, cmt. n.4 factors, further establishes that an aggravating role enhancement is not appropriate in the instant matter.

**C. The proper drug quantity level, as per U.S.S.G. § 2D1.1(c) is 26**

At the outset of the hearing, the government conceded that it would only try to establish a base offense level of 30, stating: "Under that number, we do intend to establish at least a Level 30 base offense level based on the drug amounts, though with the additional evidence it might be a little higher. But that is lower than we initially posited in the letter, your Honor."[98] This concession is more in line with the base offense level of 26 offered in the government's plea offer.[99] So the level 38 previously advocated by the government is out. However, the evidence evinced at the hearing does not even support a level 30.[100] Agent Basso and Mr. Martinez were the government's witnesses to establish this point, but they failed to do so.

Agents Basso's testimony, on this issue, merely amounted to a recitation of the controlled buys.[101] These sales, which are not in dispute, are listed at ¶ 8 of the Presentence Report and total approximately 26 kilograms of Converted Drug Weight, which amounts to a drug quantity level of 16. U.S.S.G. § 2D1.1(c)(12).

---

[97]*Id.* at 189, 190.

[98]*Id.* at 6.

[99]*See* Doc. No. 170, Exhibit A attached to Defendant's Objections to the Presentence Report.

[100]This total is consistent with the government's July 20, 2020 letter to the defense, setting forth "additional particulars regarding the government's evidence of your client's narcotics distribution."[100] By our calculation the figures, in the particulars, total approximately 544.8 grams of heroin and 153 grams of cocaine base, which results in a level 30 of Converted Drug Weight. *See* Drug Conversion Calculator at https://guidelines.ussc.gov/de.

[101]Tr. at 61, 65, 66, 68, 69-76.

For his part, Mr. Martinez offered uneven and contradictory testimony.[102] He could not even recall when he moved to 130 Moore Street.[103] He made fantastic claims like Mr. Smith kept his "stash" in a public balcony,[104] then contradicted himself, stating he had never seen Mr. Smith do that, and that Mr. Smith was not the only dealer who stashed drugs there.[105] Mr. Martinez was thoroughly impeached, as already mentioned.[106] We also highlighted that Mr. Martinez did not plea guilty to fentanyl, but heroin distribution.[107] His plea stands in total opposition to one of the supposed purposes of his testifying – to detail Mr. Smith's distribution of fentanyl as an insider. Clearly, he was not. Mr. Martinez also admitted he dealt with Mr. Smith for only about a year and a half.[108] He also conceded that he did not work with Mr. Smith, but was essentially his own man, running his own affairs, obtaining drugs for people from dealers like Mr. Smith and getting paid by customers for purchasing and delivering drugs to them.[109] His unhelpful testimony can be summed up with this question and answer: "Q As you've testified before, you didn't sell drugs for Jessie; correct? A Yes."[110]

**D. The firearm enhancement should not be applied, as per U.S.S.G. § 2Dl.l(b)(1)**

The issue of whether a firearm enhancement should be applied is easily disposed of. At the hearing, Agent Basso conceded, that he had no specific evidence or knowledge that the shooting was related to the narcotics distribution in this case.[111] That ends the analysis. Basso did not know if Jojo, the robbery victim, was involved in distributing narcotics with, or without, Mr. Smith, when he admitted: "A I do not have direct knowledge that he was specifically involved in the heroin trafficking that Mr. Smith was involved with."[112] Agent Basso also admitted that he was just theorizing and, in the end, his testimony boiled down to mere suspicion.[113] Perhaps the best example of this non-evidence happened when Agent Basso conceded the following:

---

[102] *Id.* at 183-206.

[103] *Id.* at 201 ("MR. ZAPANA: His math doesn't quite work, right?").

[104] *Id.* at 203-204, 249-52.

[105] *Id.* at 206.

[106] *Id.* at 230-235.

[107] *Id.* at 236, 256-257.

[108] *Id.* at 242.

[109] *Id.* at 243-247.

[110] *Id.* at 243, 244

[111] *Id.* at 133-137.

[112] *Id.* at 135.

[113] *Id.* at 134-137.

> Q So, you don't know if this was personal, right, what motivated the shooters, if there was some personal viewpoint; do you know that?
> A It could have been personal, I suppose, but –
> Q So, that's a theory, right?
> A That is a theory, that it's personal.[114]

Jose Martinez's testimony was similarly unhelpful. He merely claimed that he had witnessed Mr. Smith discharge a firearm up in the air at an unknown time and circumstance, of what may have been "blanks", for an unknown reason.[115]

Clearly, the enhancement should not be applied based on this lack of evidence.

Respectfully,

/s/Michael Hueston
Gary Kaufman

cc: Counsel of Record

[114] *Id.* at 137.

[115] *Id.* at 208, 264.